UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DENNIS F. KRAUSE,

                    Plaintiff,

v.                                               1:11-CV-0098
                                                 (GTS/RFT)

CSX TRANSPORTATION,

                    Defendants.
_____

APPEARANCES:                         OF COUNSEL:

FINKELSTEIN & PARTNERS          MARSHALL P. RICHER, ESQ.
  Counsel for Plaintiff
80 Wolf Road
Suite 503
Albany, NY 12205

WILLIAMS CUKER BEREZOFSKY, LLC    SAMUEL ABLOESER, ESQ.
  Counsel for Plaintiff
1515 Market Street
Suite 1300
Philadelphia, PA 19102

ECKERT SEAMANS CHERIN & MELLOTT, LLC   LAWRENCE R. BAILEY, Jr., ESQ.
  Counsel for Defendant
10 Bank Street
Suite 1061
White Plains, NY 10606

HON. GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

      Currently before the Court, in this FELA action filed by plaintiff, Dennis F. Krause

("Plaintiff") are a motion for summary judgment by defendant, CSX Transportation ("Defendant"), a

motion for partial summary judgment by Plaintiff, and a motion *in limine* to preclude certain expert

testimony by Defendant.  *See* Dkt. Nos. 29, 30, and 28, respectively.  For the reasons set forth below, Defendant's motion for summary judgment is denied, Plaintiff's motion for partial summary judgment is denied, and Defendant's motion in limine is granted.

## I.      RELEVANT BACKGROUND

### A.      Plaintiff's Claim

Generally, Plaintiff's Complaint asserts a claim to recover damages from Defendant for personal injuries under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.* ("FELA").  (*See generally* Dkt. No. 1 [Pl.'s Compl.].)

More specifically, Plaintiff alleges that on February 19, 2009, while performing his duties as a carman employed by Defendant at its railroad yard in Selkirk, New York, he was injured when he fell off of a railcar and struck the ground.  (*Id.*, at ¶ 5.)  Plaintiff alleges that as a result, he sustained injuries to his right knee and back.  Plaintiff further alleges that his injuries were caused by the negligence of Defendant.

### B.      Recitation of Undisputed Facts

The following material facts[1] are gleaned from Defendant's Local Rule 7.1 Statements of Undisputed Material Facts and Plaintiff's response thereto (*see* Dkt. No. 29-20 [Def.'s Rule 7.1 Statement]; Dkt. No. 33 [Pl.'s Resp. to Def.'s Rule 7.1 Statement]) as well as Plaintiff's Local Rule 7.1 Statements of Undisputed Material Facts and Defendant's response thereto (*see* Dkt. No. 30 [Pl.'s Rule 7.1 Statement]; Dkt. No. 32-13 [Def.'s Resp. to Pl.'s Rule 7.1 Statement]).  Local Rule

---

[1]      Conclusions of law in a Local Rule 7.1 Statement, even when unopposed, are not deemed admitted.  *See Johnson v. Enu*, No. 08-CV-158, 2011 WL 3439179, at *1 (N.D.N.Y. July 13, 2011) (Homer, M.J.), *adopted in its entirety by*, 2011 WL 3439524 (N.D.N.Y. Aug. 5, 2011) (Scullin, J.).

7.1(a)(3) of the Local Rules of Practice for this Court requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. *See* N.D.N.Y. L. R. 7.1(a)(3). It further provides that, to the extent that the nonmoving party fails to do so, the facts asserted in the movant's Statement of Material Facts will be deemed admitted, as long as they are supported by the record. *Id*.

Leading up to the February 19, 2009 accident underlying this action, Plaintiff worked for 38 years as a carman, inspected thousands of railcars and had climbed up and on thousands of railcars in the process of inspecting them. On February 19, 2009, around 2:00 p.m., Plaintiff fell from a railcar. Plaintiff alleges that, as of the time of the accident, he had not yet had a lunch break during his shift.

In 2009, carmen employed by Defendant were part of the Transport Workers Union and worked under the collective bargaining agreement for the Brotherhood of Railway Carmen. Under the agreement in place on February 19, 2009 ("the Agreement"), the standard shift was eight hours. Up to three shifts could be employed on a given day. The timing of a lunch break varied depending on the number of shifts employed. If three shifts were employed, lunch was to be given within the limits of the fifth hour of the shift. On February 19, 2009, three carmen shifts were employed. Lunch break was typically twenty minutes. However, under Rule 3 of the Agreement, carmen could be asked to work through lunch, as long as they were compensated for that time and allowed to

3

procure lunch afterward.[2]

On the day of the accident, Plaintiff's shift began at 7:00 a.m. and ended at 3:00 p.m.  As was his usual habit, Plaintiff arrived for work that day at 6:30 a.m.  On his way to work, Plaintiff would typically stop at a convenience store and buy coffee or a bun.  Plaintiff testified that he routinely stopped to get coffee and a bun or have a bowl of cereal, but he could not remember what in particular he ate on the morning of the accident.

On an average day, with the help of another carman, Plaintiff typically inspected three to four trains.  On the morning of February 19, 2009, after attending a job briefing and receiving his assignment for the day, Plaintiff began his inspections with his regular teammate, Vic Jurevis.  At some point, either during the break between the first and second train, or during the break between the second and third train, Plaintiff and Mr. Jurevis went to the yard shanty to input bad orders into the system.  Although Plaintiff could have eaten something at that time, Plaintiff claims he did not do so.  During that same window – between the first and third trains – Plaintiff and Mr. Jurevis received a call from senior general foreman Jeff Hensley, requesting a meeting with them in the west end receiving yard.  After completing the train they were working, Plaintiff and Mr. Jurevis met Mr.

---

[2]        Although Plaintiff admits this statement of fact, he points out that on the day of his accident, he was told that he did not need a lunch break because he already had one earlier that day.  In support of this point, Plaintiff cites a handwritten "statement" from Derek A. Douglas that is not signed under penalty of perjury and is not dated.  Moreover, the statement is filed as "Exhibit A" to Plaintiff's memorandum of law and has not been ushered into the record by attorney affidavit, which is the proper procedure for submitting evidence on a motion for summary judgment.  Accordingly, in its current form, the statement from Mr. Douglas is not authenticated.  However, there is no need to comply with the formal requirement that evidence be authenticated where it is clear that documents submitted by a non-moving party could be produced in admissible form at trial.  *See Rosenthal v. Nierenberg*, No. 09-CV-8237, 2010 WL 3290994, at *2, n.2 (S.D.N.Y. Aug. 10, 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548 (1986) (nonmoving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment")).

Hensley as requested.  According to Mr. Hensley, the meeting lasted probably thirty to forty-five minutes, during which time both Plaintiff and Mr. Jurevis ate and drank coffee.  According to Plaintiff, the meeting lasted between ten and fifteen minutes.  Also, Plaintiff testified that he hadn't had anything to eat between the time of his morning coffee and bun or cereal and the time of the accident.  Likewise, Mr. Jurevis testified that he hadn't had anything except coffee between the time he reported to work and the time of the accident.[3]  In any event, after the conclusion of their meeting with Mr. Hensley, Plaintiff and Mr. Jurevis began working on the third train.

While working on the third train, Plaintiff asked another carman, Derek Douglas, to call Mr. Hensley or the general foreman, Matt Sams, to request help so that Plaintiff and Mr. Jurevis could take a lunch break.  According to Mr. Douglas, this conversation took place sometime between noon and 1 p.m.  Shortly after, Mr. Douglas radioed back to Plaintiff that Mr. Sams had spoken with Mr. Hensley, and Mr. Hensley had said he considered their earlier meeting as their lunch break, they would not be relieved for lunch, and that they were to continue working the trains.  Therefore, Plaintiff and Mr. Jurevis began to work the fourth train.

Plaintiff began working at the west end of the train.  While performing his inspections, Plaintiff came upon a series of tank cars used for carrying dangerous materials, which did not have the required placards denoting the contents of the tanks.  As a result, Plaintiff began writing up bad order tickets for those cars.  As he was writing a bad order ticket for one of the cars, Plaintiff crossed

---

[3]      In his response to Defendant's Rule 7.1 Statement, Plaintiff quotes deposition testimony of Mr. Jurevis, citing the respective transcript.  However, Plaintiff fails to submit the cited transcript to the Court as part of the record on summary judgment.  Assuming the transcript is available and Plaintiff has accurately cited the testimony from it, the Court will consider it. However, the appropriate method is for counsel to submit an affidavit ushering evidence into the record and to submit copies of the evidence as exhibits to the affidavit.

over the tank car to tag the other side, since federal law requires both sides be tagged.  As he was returning, Plaintiff fell to the ground.  Specifically, Plaintiff testified that he got light-headed, and the next thing he knew, he was on the ground.  Plaintiff also testified that prior to fainting, he did not feel like he was going to faint and did not tell anyone that he felt like he might faint.  This was the first time Plaintiff ever fainted, even though he missed meals before.  Consequently, Plaintiff never told Mr. Sams, Mr. Hensley or any other of Defendant's managers that he was prone to fainting if he did not eat.

As Plaintiff was getting hold of himself, he called Mr. Jurevis on the radio and explained what happened.  These events occurred around 2:00 p.m.  Upon getting up from the ground, Plaintiff experienced pain in his right leg, and thus sat down on the cut lever of the tank car.  While Plaintiff was sitting there, Tommy Rosario, a fellow rail worker, drove up and helped Plaintiff get into the truck.  Mr. Rosario drove Plaintiff to the east end gate, which was chained shut.  Consequently, Mr. Rosario turned around and drove to the west end gate.  When they arrived at the west end gate, they found an ambulance waiting.  After Plaintiff informed the EMS personnel that his right knee hurt, he was put on a stretcher, loaded into the ambulance, and taken to the hospital.

Prior to the date of the accident, Plaintiff had a history of right knee problems.  Plaintiff was treated at Capital Region Orthopaedics from 2002 through 2006, and then again after the accident on February 19, 2009.  On April 3, 2006, Dr. Jeffrey Lozman, M.D. noted that x-rays showed significant degenerative change in the right knee and opined that Plaintiff "may come to knee replacement [at] some point in the future."  (Dkt. No. 32-9 [Ex. G to Decl. of Lawrence R. Bailey, Jr., July 30, 2012].)  In a report dated November 30, 2011, Dr. Lozman noted that another doctor in his medical group, Dr. Striker, saw Plaintiff on February 21, 2009, two days after the accident.  Dr.

6

Striker noted that Plaintiff "sustained a twisting injury to his knee and fell," and thereafter was "seen at St. Peter's Hospital for evaluation since he lost consciousness."  (Dkt. No. 30-4 [Ex. B. to Bailey Decl.].)   Plaintiff eventually underwent a total right knee replacement on September 1, 2009.  On September 18, 2009, Dr. Lozman clarified that Plaintiff's "operative necessity for total knee replacement was hastened by the traumatic injury that he had at work, (sic) certainly this was not the cause of his arthritis."  (Dkt. No. 32-10 [Ex. H to Bailey Decl.].)

On April 4, 2012, Plaintiff was evaluated by Dr. Barry Constantine, M.D. at the request of Defendant.  Dr. Constantine, an orthopedic surgeon, reviewed Plaintiff's medical records and opined that "it is apparent that [Plaintiff] has significant and advanced degenerative arthritic change in his right knee which well antedated the industrial accident of February 19, 2009."  (Dkt. No. 30-5, at 5 [Ex. C to Pl.'s Mem. of Law].)  Dr. Constantine opined that "[Plaintiff's] right total knee replacement was necessitated as a result of both the severe pre-existing and progressive arthritis as well as the industrial accident of February 19, 2009."  (*Id.*, at 6.)  Accordingly, Dr. Constantine noted that he "would apportion two-thirds of the need for the right total knee replacement to the pre-existing arthritis and one-third to the industrial accident of February 19, 2009."  (*Id.*)  Finally, Dr. Constantine stated, "Due to the advanced degenerative arthritis and irrespective of the February 19, 2009 incident, in my medical opinion [Plaintiff] would have eventually required a right total knee replacement."  (*Id.*)

In its response to Plaintiff's Rule 7.1 Statements, Defendant asserts additional statements of fact that Plaintiff has not opposed.  Specifically, Defendant asserts that there was no accident as described by Plaintiff on February 19, 2009 and that Plaintiff did not pass out, faint or fall while inspecting the tank cars on February 19, 2009.  (*See* Dkt. No. 32-13, at ¶¶ 10-12 [Resp. to Pl.'s

Statement of Material Facts].)  In support of these statements, Defendant cites Plaintiff's testimony

that he got light-headed and the next thing he knew he was on the ground, that he does not know if

he blacked out completely, and that he has been over-hungry before but has never fainted.  In

addition, Defendant cites Dr. Lozman's April 3, 2006 treatment note that Plaintiff reported that his

right knee had occasionally kicked out on him and almost sent him into a moving train.  Finally,

Defendant cites Dr. Constantine's note that there is no evidence or documentation indicating

whether Plaintiff actually passed out.  All of this evidence merely creates factual questions for a jury

to decide about whether Plaintiff's version of events are true.  Accordingly, because the record does

not support Defendant's conclusory additional Rule 7.1 statements, the Court will not deem them

admitted.

        C.       **Expert Report of Leslie R. Hinds, Ph.D.**

In opposing Defendant's motion for summary judgment, Plaintiff relies in part on the report

of his proffered expert, Leslie R. Hinds, Ph.D.  According to Plaintiff, Dr. Hinds is an expert in

railroad safety with more than 48 years of experience in the railroad industry.  In his report, Dr.

Hinds sets forth eight separately numbered opinions and corresponding conclusions.  Defendant

seeks to preclude each of those opinions and conclusions except the first and third, which, Defendant

asserts, have been withdrawn by Plaintiff.

Generally, Defendant challenges the following numbered opinions and/or conclusions of Dr.

Hinds.

(2) As a full member of the Association of American Railroads ("AAR"), Defendant has the

obligation, responsibility and ability to develop safe work practices and safe equipment for use by its

employees and other personnel working in railroad transportation.  (*See* Dkt. No. 28-1, at 27 [Ex. A

to Def.'s Mot. *in Limine*].)

(4)  On February 19, 2009, Defendant supervisors Jeffrey Hensley and Matthew Sams were devoid of concern for the health and welfare of Plaintiff and Victor Jurevis when they, as supervisors, ordered Plaintiff and Mr. Jurevis to work through their lunch break.  When they ordered these employees to work through their lunch break, they changed the working conditions and endangered their well being.  They also failed to hold a job briefing which they were required to do because they were changing their working conditions.  The injury to Plaintiff was a result of his supervisors' negligent actions when they refused to allow him to eat lunch.  The injury was reasonably foreseeable and preventable. (*See id*., at 28.)

(5) An employee who works under these conditions will become fatigued and his stress level will increase.  As a result, it is vital that railroad workers such as Plaintiff obtain timely nourishment in order to maintain their strength and be able to properly do their job.  (*See id*., at 29.)

(6)  On February 19, 2009, Plaintiff did not violate any rules and regulations of Defendant, AAR or the Federal Railroad Administration while performing his duties inspecting rail cars.  Plaintiff was dressed properly and he complied with all safety rules of Defendant.  (*See id*..)

(7)  Plaintiff and Mr. Jurevis had inspected several trains before they requested their lunch break.  To request lunch was not an unreasonable request.  The fact that Mr. Hensley and Mr. Sams refused to allow Plaintiff and his partner to eat was unreasonable and unsafe.  The railroad and the union agreed that a lunch break would be given to the carmen within the fifth hour.  It is recognized that employees on the railroad and those working in other industrial jobs need to eat lunch during the middle part of their work day to maintain their strength.  Managers and supervisors are responsible to plan their work to ensure that there are enough employees available to work the trains in the receiving yard.  Management's failure to fill the jobs does not justify ordering employees to work through their lunch period.  (*See id*., at 30-31.)

9

(8)  On the day of the accident, Plaintiff was entitled to eat his lunch within the fifth hour as stated in the Agreement.  Under the Agreement, Plaintiff was entitled to eat between the fourth and fifth hour.  It is clear that the failure of Defendant supervisors Hensley and Sams to abide by the Agreement and allow Plaintiff and Mr. Jurevis to eat a good meal jeopardized the health and safety of the employees.  Employees like carmen/car inspectors who work in the cold performing duties such as walking extreme distances on ballast, climbing up and down on rail cars, crawling under rail cars, bending and stooping, reaching and pulling and using tools to make repairs need nourishment in order to perform these duties.  They can only maintain their strength and health by eating a good meal . . . .  Employees who work in all types of jobs in all walks of life eat their lunch in the middle of their work day.  This is the only way workers can remain healthy and stay alert.  With a reasonable degree of safety certainty, the cause of the accident to Plaintiff was the negligence and failure of Defendant and its supervisors to provide Plaintiff with a safe place to work for the reasons stated in the body of this report.  (*See id.*, at 31-32.)

**D.    Defendant's Motion for Summary Judgment**

Generally, in support of its motion for summary judgment, Defendant asserts the following arguments: (1) Defendant did not breach its duty of care because its denial of Plaintiff's request for lunch (a) did not constitute a "hazard" and (b) was not unreasonable because it was not reasonably foreseeable that Plaintiff would faint; and (2) Plaintiff's claim fails as a matter of law because he has not and cannot establish causation.  (*See generally* Dkt. No. 29-19, at 7-18 [Def.'s Mem. of Law].)

Generally, in response to Defendant's motion for summary judgment, Plaintiff asserts the following arguments: (1) Defendant's denial of Plaintiff's request for lunch constituted a potential hazard under FELA because (a) a potential hazard under FELA need not be a tangible object,

condition or defect and (b) Defendant's denial of Plaintiff's request for a lunch break was not

permitted under the terms of the applicable collective bargaining agreement; (2) Defendant's denial

of Plaintiff's request for a lunch break was unreasonable under FELA because it was reasonably

foreseeable that, as a result of the denial, Plaintiff would suffer an injury, given that (a) under FELA,

Plaintiff need not establish that the particular consequence of Defendant's negligence was

foreseeable to Defendant and (b) under FELA, Plaintiff is not required to establish that Defendant

had either actual or constructive notice that Plaintiff would faint; and (3) Plaintiff has established

and can establish causation under the applicable relaxed FELA standard.  (*See generally* Dkt. No.

33, at 8-15 [Pl.'s Opp'n Mem. of Law].)

Generally, in its reply memorandum of law, Defendant asserts the following arguments: (1)

there was no "hazard" or "potential hazard," (2) no injury was reasonably foreseeable, and (3) Dr.

Charash's report does not and cannot establish the requisite causation for Plaintiff's claim.  (*See*

*generally* Dkt. No. 37, at 2-7 [Def.'s Reply Mem. of Law].)

### E.      Plaintiff's Motion for Partial Summary Judgment

Generally, in support of his motion for partial summary judgment, Plaintiff assets the

following arguments: (1) the issue of medical causation is ripe for summary judgment; (2) the

United States Supreme Court has interpreted FELA as prescribing a relaxed standard of causation

that departs from the ordinary proximate cause requirement of common law negligence; and (3)

there is no genuine factual dispute as to the medical causation of Plaintiff's injury.  (*See generally*

Dkt. No. 30, at 3-7 [Pl.'s Mem. of Law].)

Generally, in response to Plaintiff's motion for partial summary judgment, Defendant asserts

the following arguments: (1) Plaintiff's medical causation argument is premature and inappropriate

for resolution by summary judgment because (a) there is a fact issue about whether the February 19,

11

2009 accident occurred, and whether it occurred as Plaintiff claims it did, (b) Dr. Constantine's

opinions were based on Plaintiff's disputed account of events, and (c) Dr. Lozman's own pre and

post incident treatment notes contradict the opinions in his report; and (2) Defendant, not Plaintiff, is

entitled to judgment as a matter of law because Plaintiff cannot establish that Defendant breached its

duty of care and because Plaintiff has not and cannot establish causation.  (*See generally* Dkt. No.

32-14, at 2-9 [Def.'s Opp'n Mem. of Law].)

Generally, in his reply memorandum of law, Plaintiff asserts the following arguments: (1)

Plaintiff's medical causation argument is ripe for resolution by summary judgment because (a) there

is no dispute as to Plaintiff's account of the accident, (b) Dr. Constantine's opinion is not based on

Plaintiff's disputed account of events, and (c) Dr. Lozman's opinion that the incident of February 19,

2009 resulted in Plaintiff's permanent pain and disability and necessitated a total knee replacement

is not contradicted by any evidence; and (2) Defendant's argument that it is entitled to summary

judgment is inappropriate.  (*See generally* Dkt. No. 35, at 4-13 [Pl.'s Reply Mem. of Law].)

In its sur-reply, filed with permission of the Court, Defendant asserts the following

arguments: (1) Plaintiff inappropriately raised issues for the first time in its reply brief and filed a

reply brief in excess of the page limit set by the Local Rules; and (2) Plaintiff's reply actually

demonstrates why summary judgment on the issue of medical causation is inappropriate.  (*See

generally* Dkt. No. 40, at 1-5 [Def.'s Sur-Reply Mem. of Law].)

### F.    Defendant's Motion *in Limine* to Preclude Expert Testimony

In support of its motion *in limine* seeking to preclude the expert testimony, report, or any

mention of the report of Plaintiff's proffered expert, Leslie R. Hinds, Ph.D., Defendant asserts the

following arguments: (1) Dr. Hinds is not qualified to give medical opinions or conclusions because

he is not a medical doctor; (2) Dr. Hinds's opinions and conclusions regarding the Association of American Railroads and the lunch time for all workers are unreliable because they are based on pure speculation and conjecture; and (3) Dr. Hinds's opinions should be excluded because they do not assist the trier of fact in that they improperly usurp the function of the jury and concern matters that the average juror is capable of understanding and determining.  (*See generally* Dkt. No. 28-3, at 1-13 [Def.'s Mem. of Law].)

Generally, in response to Defendant's motion *in limine*, Plaintiff asserts the following arguments: (1) Defendant's motion *in limine* should be denied because it is untimely and (2) Dr. Hinds's testimony and expert report are admissible because (a) Dr. Hinds offers safety opinions and conclusions, not medical opinions and conclusions, (b) Dr. Hinds's opinions and conclusions are not based on speculation and conjecture, (c) Dr. Hinds's opinions assist the trier of fact and do not improperly usurp the function of the jury, and (d) Dr. Hinds's expert opinions are not improper legal conclusions.  (*See generally* Dkt. No. 31, at 2-14 [Pl.'s Opp'n Mem. of Law].)

Generally, in its reply memorandum of law, Defendant asserts the following arguments: (1) Defendant's motion *in limine* is timely and (2) the thrust of Dr. Hinds's opinions and conclusions are not about railroad operations or safety, but are (a) medical opinions, (b) speculation and conjecture, (c) unhelpful and unnecessary, and (d) legal conclusions.  (*See generally* Dkt. No. 34, at 2-4 [Def.'s Reply Mem. of Law].)

## II.    GOVERNING LEGAL STANDARDS

### A.    Standard Governing a Motion for Summary Judgment

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  In determining whether a genuine dispute as to a material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598 (1970)).  In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548 (1986).  However, when the moving party has met this initial responsibility, the nonmoving party must identify evidence in the record that creates a genuine issue of material fact.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986)).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citation omitted).

As for the genuineness requirement, a dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Id.*  As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted; emphasis added).[4] Similarly, inadmissible hearsay is insufficient to create a genuine issue of fact, "absent a showing that admissible evidence will be available at trial."  *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (citations omitted).

---

[4]       As the Supreme Court has famously explained, "[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S. Ct. 1348 (1986) (citations omitted).

**B.      Standards Governing Expert Evidence**

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Specifically,

the rule provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the testimony is
> the product of reliable principles and methods, and (3) the witness has
> applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under this rule, the trial judge stands as a "gatekeeper," charged with

determining whether the proffered testimony satisfies a number of standards, including, among other

things, that "the expert's scientific, technical, or other specialized knowledge will help the trier of

fact to understand the evidence or to determine a fact in issue."  *Marvel Characters, Inc. v. Kirby*, —

F.3d —, —,  2013 WL 4016875 (2d Cir. 2013) (quoting Fed. R. Evid. 702(a)).  "In other words,

'[e]xpert testimony must be helpful to the [trier of fact] in comprehending and deciding issues

beyond the understanding of a layperson.'"  *Id.* (quoting *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d

Cir.2005)).

Additionally, the proposed expert must be "qualified" to give the proffered opinion.  *Daubert*

*v. Merrell Dow Pharm.*, 509 U.S. 579, 589-90, 597 & nn. 7, 10, 113 S. Ct. 2786 (1993).  "To

determine whether a witness qualifies as an expert, courts compare the area in which the witness has

superior knowledge, education, experience, or skill with the subject matter of the proffered

testimony."  *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citation omitted).  In assessing

whether a proposed expert is "qualified," the trial judge should remember the "liberal[] purpose" of

Fed. R. Evid. 702, and remain "flexibl[e]" in evaluating the proposed expert's qualifications.  *See*

15

*U.S. v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (holding that Fed. R. Evid. 702 "must be read in light of the liberalizing purpose of the rule"); *Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994 (Hurd, M.J.) ("[L]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications."), *aff'd without opinion*, 101 F.3d 682 (2d Cir. 1996).  Having said that, of course, "a district court may properly conclude that witnesses are insufficiently qualified . . . [where] their expertise is too general or too deficient." *Stagl v. Delta*, 117 F.3d 76, 81 (2d Cir. 1997), *accord*, *Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp. 2d 413, 425-26 (W.D.N.Y. 2005); *Byrne v. Liquid Asphalt Systems, Inc.*, 238 F. Supp. 2d 491, 494 (E.D.N.Y. 2002); *Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247, 252 (S.D.N.Y. 1997); *see, e.g.*, *McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657-58 (2d Cir. 1992) (affirming district court's ruling that plaintiff's proffered expert did not possess the required qualifications to testify as an expert on the subject of warning labels for hot melt glue).

A witness qualified as an expert will be permitted to testify if his testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (quoting Fed. R. Evid. 702).  "To be admissible, expert testimony must be both relevant and reliable." *Melini v. 71st Lexington Corp*., 07-CV-0701, 2009 WL 413608, at *4 (S.D.N.Y. Feb. 13, 2009) (citing *Daubert*, 509 U.S. at 589).  "Specifically, expert opinion testimony must be (1) 'based upon sufficient facts or data,' (2) 'the product of reliable principles and methods,' and (3) the result of applying those principles and methods to the facts of the case in a reliable manner." *Melini*, 2009 WL 413608, at *4 (quoting Fed. R. Evid. 702).  "The proponent of expert testimony must establish its admissibility by a preponderance of the evidence." *Id*. (citing *Astra Aktiebolag v. Andrx Pharm., Inc*., 222 F. Supp. 2d 423, 487 (S.D.N.Y. 2002) (citing Fed. R. Evid. 104(a))).

In *Daubert*, the Supreme Court set forth a non-exclusive list of factors for a trial court to use when assessing the reliability of expert testimony: (1) whether the expert's technique or theory can be, or has been, tested–that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.  *Daubert*, 509 U.S. at 593-94; *see also* Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments.

In addition, "[c]ourts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact."  Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments.  These factors include the following: (1) whether the expert is "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying";[5] (2) whether the expert has unjustly extrapolated from an accepted premise to an unfounded conclusion;[6] (3) whether the expert has adequately accounted for obvious alternative explanations for the plaintiff's condition;[7] and (4) whether the field of expertise claimed by the expert is known to reach reliable results for the type of

---

[5]        *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

[6]        *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512 (1997) (noting that, in some cases, a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

[7]        *See Claar Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994) (precluding expert's testimony where expert failed to consider other obvious causes for plaintiff's condition).

opinion the expert would give.[8]

The Second Circuit has further explained the trial court's duties when evaluating expert testimony in the following manner:

> First, . . . *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence.  Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid 'safeguards' for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question. Third, *Daubert* allows for the admissibility of scientific evidence, even if not generally accepted in the relevant scientific community, provided its reliability has independent support.  Finally, the Court expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.

*Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (internal citation omitted).  "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  Instead, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004).  "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'"  *Melini*, 2009 WL 413608, at *5 (quoting *Amorgianos*, 303 F.3d at 267).

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Amorgianos*, 303 F.3d at 266; *accord*, *Ruggiero v. Warner-Lambert*

---

[8]      *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 119 S. Ct. 1167, 1175 (1999).

*Co.*, 424 F.3d 249, 253 (2d Cir. 2005).[9]  Furthermore, "it is critical that an expert's analysis be reliable at every step."  *Amorgianos*, 303 F.3d at 267.  Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions."  *Id*. at 266 (citing *Daubert*, 509 U.S. at 595).  Nevertheless, "conclusions and methodology are not entirely distinct from one another."  *General Elec. Co.*, 522 U.S. at 146.  Accordingly "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*.

Finally, the *Daubert* rule applies to scientific knowledge, as well as technical or other specialized knowledge.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167 (1999) ("We conclude that *Daubert's* general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.") (citing Fed. R. Evid. 702).

In sum, in acting as a gatekeeper, the court is responsible for "keep[ing] unreliable and irrelevant information from the jury," because of its "inability to assist in factual determinations, its

---

[9]        *See also Zaremba v. Gen. Motors Corp*., 360 F.3d 355, 358-60 (2d Cir. 2004) (holding that expert testimony that was speculative and unreliable was properly not considered by the district court on summary judgment); *Dreyer*, 367 F. Supp.2d at 416-17 (noting that "[a]n otherwise well-credentialed expert's opinion may be subject to disqualification if he fails to employ investigative techniques or cannot explain the technical basis for his opinion"); *Dora Homes, Inc. v. Epperson*, 344 F. Supp. 2d 875, 887-89 (E.D.N.Y. 2004) (declining to consider plaintiff's expert's testimony in deciding pending motions for summary judgment based on a finding that the expert's testimony "is unreliable under Fed. R. Evid. 702 and the principles articulated in *Daubert* and its progeny," given that the expert (1) qualified his opinions, (2) failed to support his opinions with any methodology which the Court could analyze, and (3) rested his opinions "upon nothing more than subjective belief and unsupported speculation"); *Mink Mart, Inc. v. Reliance Ins. Co.*, 65 F. Supp. 2d 176, 180 (S.D.N.Y. 1999) ("In order for an expert's opinion to be reliable and thus admissible, it must be grounded on verifiable propositions of fact") (citations omitted), *aff'd*, 99-CV-9211, 2000 WL 33223395 (2d Cir. May 30, 2000).

potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999).

> ### C.   Standards Governing Plaintiff's FELA Claim

Section 1 of FELA provides that "[e]very common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 542, 114 S. Ct. 2396, 2403 (1994) (quoting 45 U.S.C. § 51).   When Congress enacted FELA, its "attention was focused primarily upon injuries and death resulting from accidents on interstate railroads."  *Urie v. Thompson*, 337 U.S. 163, 181, 69 S. Ct. 1018, 1030 (1949).   Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the "human overhead" of doing business from employees to their employers.  *Tiller v. Atlantic Coast Line R. Co.*, 318 U.S. 54, 58-59, 63 S. Ct. 444, 447 (1943); *see also Gottshall*, 512 U.S. at 542, 114 S. Ct. at 2404.   In order to further FELA's humanitarian purposes, Congress "did away with several common-law tort defenses that had effectively barred recovery by injured workers."  *Gottshall*, 512 U.S. at 542, 114 S. Ct. at 2404. Consequently, courts have "liberally construed" FELA to further Congress' remedial goal.  *Id.* at 543, 114 S. Ct. at 2404.  For example, the Court held in *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506, 77 S. Ct. 443, 448 (1957), that a relaxed standard of causation applies under FELA.  *See Gottshall*, 512 U.S. at 543, 114 S. Ct. at 2404 (citing *Rogers*, 352 U.S. 500, 77 S. Ct. 443).   Toward that end, the Court stated that "[u]nder this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."  *Rogers*, 352 U.S. at 506, 77 S. Ct. at 448.

"That FELA is to be liberally construed, however, does not mean that it is a workers' compensation statute." *Gottshall*, 512 U.S. at 543, 114 S. Ct. at 2404.  The Supreme Court has "insisted that FELA 'does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur.'"  *Id.* (quoting *Ellis v. Union Pacific R. Co.*, 329 U.S. 649, 653, 67 S. Ct. 598, 600 (1947)).  A plaintiff bringing a FELA action must still demonstrate the four common law elements of negligence: duty, breach, foreseeability, and causation.  *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006).  "A railroad may be liable under FELA for failure to provide a safe workplace 'when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees.'"  *Syverson v. Consol. Rail Corp.*, 19 F.3d 824, 826 (2d Cir.1994) (quoting *Gallose v. Long Island R.R. Co.*, 878 F.2d 80, 84-85 (2d Cir.1989)).  Significantly, the essential element of reasonable foreseeability in FELA actions, requires proof of actual or constructive notice to the employer of the defective condition that caused the injury.  *See Gallose*, 878 F.2d at 85 ("The catalyst which ignites [the duty to provide a safe workplace] is knowledge, either actual or constructive.").

Under FELA, "the case must not be dismissed at the summary judgment phase unless there is absolutely no reasonable basis for a jury to find for the plaintiff."  *Syverson*, 19 F.3d at 828 (2d Cir.1994) (citing *Gallick v. Baltimore and O.R. Co.*, 372 U.S. 108, 120-21, 83 S. Ct. 659, 667 (1963)).  On the other hand, although FELA plaintiffs are entitled to have reasonable inferences drawn in their favor from the facts, they may not survive a motion for summary judgment when the inferences they ask a court to draw are mere possibilities.  *See Connors v. Consol. Rail Corp.*, No. 90-CV-464, 1993 WL 169646, at *8 (N.D.N.Y. May 19, 1993) (citing *Gibson v. American Broadcasting Cos. Inc.*, 892 F.2d 1128, 1132 (2d Cir.1989)).

III.    **ANALYSIS**

    A.    **Whether Defendant's Motion *in Limine* is Timely**

        After carefully considering the matter, the Court answers this question in the affirmative, generally for the reasons stated by Defendant in its reply memorandum of law.  (Dkt No. 34, at 1 [Def.'s Reply Mem. of Law].)  Moreover, regardless of the issue of timeliness of Defendant's motion to preclude Dr. Hinds's expert report and testimony, the Court, in its role as gatekeeper, must still decide whether such evidence is reliable before it is presented to a jury.  In addition, Plaintiff is not prejudiced by Defense counsel's assertion to the Court that Defendant would be filing its motion *in limine* by June 19, 2012, despite seeking a two-week extension to file its motion for summary judgment.  In the Court's previous Orders, as well as filings of counsel, it is clear the parties understood that the deadline for filing of dispositive motions includes motions to preclude expert witness testimony.  (*See* Dkt. Nos. 10, 14, 20, 21, 22.)  Accordingly, Plaintiff's argument that Defendant's motion should be denied as untimely is rejected.

    B.    **Whether Certain Opinions of Doctor Hinds Are Admissible Under Fed. R. Evid. 702**

        After carefully considering the matter, the Court answers this question in the negative, generally for the reasons stated by Defendant in its memorandum of law.  (Dkt No. 28-3, at 1-13 [Def.'s Mem. of Law].) The Court would add the following points.

        Defendant argues that certain of Dr. Hinds's opinions and conclusions are inadmissible because they are either opinions that he is not qualified to give, unreliable because they are based on speculation and conjecture, and/or they do not assist the trier of fact because they are either irrelevant, are legal conclusions, or concern matters that the average juror is capable of understanding and determining.  Plaintiff counters that Dr. Hinds's opinions are regarding railroad safety, not medical conditions or causation, are based on his extensive experience in the railroad

industry, and are regarding what constitutes a safe working environment at a rail yard, which is beyond the ken of the average juror.

1.   **Dr. Hinds's Qualifications**

Defendant argues that Dr. Hinds is not qualified to give medical opinions or conclusions because he is not a medical doctor.  Specifically, Defendant challenges three of Dr. Hinds's conclusions on this ground.  First, Dr. Hinds concludes that an employee who works under the conditions that carmen/inspectors work under at Defendant's Selkirk Yard will become fatigued and his stress level will increase, thus requiring timely nourishment in order to maintain his strength. Next, Dr. Hinds concludes that "[i]t is recognized that employees on the railroad and those working in other industrial jobs need to eat lunch during the middle part of their work day in order to maintain their strength." (*Id.* at 30.)  Finally, Dr. Hinds concludes that "[e]mployees like carmen/car inspectors who work in the cold performing duties such as walking extreme distances on ballast, climbing up and down on rail cars, crawling under rail cars, bending and stooping, reaching and pulling and using tools to make repairs need nourishment in order to perform these duties.  They can only maintain their strength and health by eating a good meal . . . .  Employees who work in all types of jobs in all walks of life eat their lunch in the middle of their work day.  This is the only way workers can remain healthy and stay alert." (*Id.* at 31.)

The Court is mindful, as indicated above in Part II.B. of this Decision and Order, that it must remain flexible in evaluating the qualifications of an expert, but that, where a witness's expertise is too deficient, it may properly deem that witness insufficiently qualified.  Moreover, it is the Plaintiff's burden to show that his expert is qualified to testify competently regarding the matters he intends to address.  *See Akin v. Hankook Tire Amer. Corp.*, No. 02-CV-1537, 2004 WL 6041788, at *2 (N.D.N.Y. May 19, 2004).  Here, Plaintiff argues that Dr. Hinds's experience renders him

qualified to give opinions regarding what constitutes a safe workplace and Defendant's failure to

provide one in direct contravention of FELA.  Plaintiff argues that because Dr. Hinds does not give a

medical diagnosis or use medical jargon, his opinions are not medical opinions, but opinions

regarding railroad safety.  Specifically, Plaintiff contends that the opinions that Defendant argues Dr.

Hinds is not qualified to give are opinions about what is typical and customary in the railroad

industry.

According to Dr. Hinds's report and attached Curriculum Vitae, he has a total of 49 years of

experience in the railroad industry, beginning with twenty years in railroad management, including

safety management and 22 years as a railroad accident investigator/consultant for various law firms,

and more recently as a railroad safety consultant/expert witness.  Dr. Hinds's educational

background includes a B.S. and a Ph.D. in business administration.  Dr. Hinds has also published

various booklets and manuals and given presentations regarding the railroad industry in general as

well as railroad safety issues and railroad accident investigations.  In his report, Dr. Hinds states that

during the course of his career, he has "investigated over 5,600 train accidents, derailments,

collisions, personal injuries and fatalities to determine the cause of and the responsibility for the

accident."  (Ex. A1 to Def.'s Mot. in Limine, at 11.)

"[W]hile experience can provide the basis to qualify a witness as an expert, the experience

must be demonstrated and have direct relevance to the issues in the case."  *Dreyer v. Ryder

Automotive Carrier Group, Inc.*, No. 98-CV-82A, 2005 WL 1074320, at *1 (W.D.N.Y. Feb. 9,

2005) (citing *Wilson v. Woods*, 163 F.3d 935, 938 (5th Cir.1999)).  Here, there is nothing in Dr.

Hinds's report to support a finding that he is qualified to give opinions regarding a railroad worker's

stress level, fatigue, and requirement for nourishment in the middle part of their day.  For this

reason, the Court grants Defendant's motion to preclude Dr. Hinds's report and testimony regarding

these opinions.

### 2.      Reliability of Dr. Hinds's Opinions

Defendant argues that four of Dr. Hinds's opinions or conclusions are not reliable because they are based on speculation and conjecture.  First, Defendant challenges Dr. Hinds's conclusion that, "[a]s a member of the AAR, [Defendant] has the obligation, responsibility and ability to develop safe work practices and safe equipment for use by their employees and other personnel working in railroad transportation."   (Dkt No. 28-1, at 27.)  Second, Defendant challenges Dr. Hinds's conclusion that, "[o]n February 19, 2009, [Defendant] Supervisors Jeffrey Hensley and Matthew Sams were devoid of concern for the health and welfare of [Plaintiff] and Victor Jurevis when they, as Supervisors, ordered [Plaintiff and Mr. Jurevis] to work through their regular lunch break." (*Id.* at 28.)  Third, Defendant challenges Dr. Hinds's conclusion that "[i]t is recognized that employees on the Railroad and those working in other industrial jobs need to eat lunch during the middle part of their work day in order to maintain their strength."  (*Id.* at 30.)  Fourth, and finally, Defendant challenges Dr. Hinds's conclusion that "[e]mployees who work in all types of jobs in all walks of life eat their lunch in the middle of their work day.  This is the only way workers can remain healthy and stay alert."  (*Id.* at 31.)

To be sure, the Court has determined that the latter two conclusions that Defendant challenges as unreliable are inadmissible because they are opinions that Dr. Hinds is not qualified to give.  Accordingly, the Court need not address the parties' arguments regarding their reliability.

Regarding Dr. Hinds's conclusion that Defendant has the obligation to develop safe work practices and safe equipment for use by their employees and other personnel working in railroad transportation, the Court finds that it is a legal conclusion and is inadmissible on that basis.  *See Tufariello*, 458 F.3d at 87 (citing *Ulfik v. Metro-North Commuter R.R.*, 77 F.3d 54, 58 (2d Cir. 1996)) ("It is [indisputable] that [defendant railroad] had a duty to provide its employees with a safe workplace.")

Finally, Dr. Hinds's conclusion that Mr. Hensley and Mr. Sams "were devoid of concern for the health and welfare" of Plaintiff and Mr. Jurevis when they ordered Plaintiff and Mr. Jurevis to work through their regular lunch break is inadmissible because, as Defendant correctly points out, "[e]xpert witnesses are not permitted to testify as to the 'knowledge, motivations, intent, state of mind, or purposes' of others." *Fleischman v. Albany Medical Center*, 728 F. Supp. 2d 130, 167-168 (N.D.N.Y. 2010) (citing *In re Fosamax Products Liability Litigation*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); *In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) ("[T]he opinions of these witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise.")).

### 3.   Whether Dr. Hinds's Opinions Assist the Trier of Fact

Lastly, Defendant argues that four of Dr. Hinds's opinions or conclusions should be excluded because they do not assist the trier of fact.  First, Defendant challenges Dr. Hinds's conclusion that, "[w]hen [Mr. Hensley and Mr. Sams] ordered [Plaintiff and Mr. Jurevis] to work through their lunch break, they changed the working conditions and endangered their well being.  They also failed to hold a job briefing which they were required to do because they were changing their working conditions.  The injury to [Plaintiff] was a result of his supervisors['] negligent actions when they refused to allow him to eat lunch.  The injury was reasonably foreseeable and preventable."  (Dkt No. 28-1, at 28.)  Second, Defendant challenges Dr. Hinds's conclusion that, on February 19, 2009, Plaintiff did not violate any rules and regulations of Defendant, AAR or the Federal Railroad Administration while performing his duties inspecting rail cars.  Plaintiff was dressed properly and he complied with all of Defendant's safety rules.  (*See id*. at 29.)  Third, Defendant challenges Dr. Hinds's conclusion that "[t]o request lunch was not an unreasonable request . . . .  The fact that Mr.

Hensley and Mr. Sams refused to allow [Plaintiff] and his partner to eat was unreasonable and unsafe.  The Railroad and the Union agreed that a lunch break would be given to the Carmen within the fifth hour. . . . It is recognized that employees on the Railroad and those working in other industrial jobs need to eat lunch during the middle part of their work day to maintain their strength . . . .  Managers and supervisors are responsible to plan their work to ensure that there are enough employees available to work the trains in the Receiving Yard.  Management's failure to fill the jobs does not justify ordering employees to work through their lunch period."  (*See id*., at 30-31.)  Fourth, and finally, Defendant challenges Dr. Hinds's opinion that, on the day of the accident, Plaintiff "was entitled to eat his lunch within the fifth hour as stated in [the Agreement] . . . . Under [the Agreement, Plaintiff] was entitled to eat between the fourth and fifth hour[,]" and his respective conclusion that, "it is clear [that the failure of Defendant supervisors Hensley and Sams] to abide by the Agreement and allow [Plaintiff] and Mr. Jurevis to eat a good meal jeopardized the health and safety of the employees . . . .  With a reasonable degree of safety certainty, the cause of the accident to [Plaintiff] was the negligence and failure of [Defendant] and its supervisors to provide [Plaintiff] with a safe place to work for the reasons stated in the body of my Report."  (*See id*., at 31-32.)

These opinions either usurp the role of the court because they are legal conclusions, or usurp the role of the fact finder since they are regarding matters that are not scientific or technical or in any way beyond the ken of the average juror.  *See Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).  Moreover, as indicated above, there is nothing in Dr. Hinds's report to support a finding that he is qualified to give an opinion regarding the requirement for nourishment in the middle part of one's workday.

27

For these reasons, the opinions of Dr. Hinds that have been challenged by Defendant are inadmissible as expert testimony under Fed. R. Evid. 702.  Accordingly, Defendant's motion *in limine* is granted.

      **C.**    **Whether Defendant is Entitled to Summary Judgment Regarding the Issue of Whether Its Denial of Plaintiff's Request for a Lunch Break Was a Hazard or a Potential Hazard Under FELA**

After carefully considering the matter, the Court answers this question in the negative, in part for the reasons stated by Plaintiff in his memorandum of law.  (Dkt No. 33, at 9-10 [Pl.'s Mem. of Law].)  The Court would add the following point.

Defendant argues that its denial of Plaintiff's request for a lunch break was not a hazard under FELA because the Agreement provided for such a denial under the circumstances existing here.  However, Plaintiff has raised a triable issue of fact regarding whether Defendant complied with the terms of the Agreement when it directed Plaintiff to finish inspecting the third train.  Specifically, there is a dispute as to whether an earlier meeting between Plaintiff, Mr. Jurevis and Mr. Hensley constituted a lunch break.[10]  Accordingly, Defendant is not entitled to summary judgment regarding this element of Plaintiff's FELA claim.

---

[10]    First, there is a dispute regarding the length of the earlier meeting between Plaintiff, Mr. Jurevis and Mr. Hensley.  Hensley testified that the meeting lasted between thirty to forty-five minutes, but Plaintiff testified that it lasted between ten and fifteen minutes, which is less that a typical twenty minute lunch break.  (*See* Dkt. No. 29-12, at 43:2-4 [Dep. of Jeffrey Hensley, Nov. 18, 2011]; Dkt. No. 29-9, at 68:23-69:3 [Dep. of Dennis Krause, Nov. 11, 2011].)  Further, there is a dispute regarding whether Plaintiff ate anything during that meeting.  Hensley testified that both Plaintiff and Mr. Jurevis ate and drank coffee at the meeting, while Plaintiff testified that he had nothing to eat between the time of his usual morning bun or cereal and the time of the accident.  (*See* Dkt. No. 29-12, at 43:11-22[Hensley Dep.]; Dkt. No. 29-9, at 81:2-7 [Krause Dep.].)

**D.     Whether Defendant is Entitled to Summary Judgment Regarding the Issue of Whether Injury was Reasonably Foreseeable**

After carefully considering the matter, the Court answers this question in the negative, in part for the reasons stated by Plaintiff in his memorandum of law.  (Dkt No. 33, at 10-13 [Pl.'s Mem. of Law].)  The Court would add the following points.

In support of his argument that injury was reasonably foreseeable, Plaintiff relies on the proposed expert testimony of Dr. Hinds that the failure to provide a lunch break at a certain point in an employee's work day creates an unsafe working condition.  To be sure, for the reasons indicated Part III.B. of this Decision and Order, Dr. Hinds's opinion in that regard is inadmissible.  However, the Court concluded that the question of whether Defendant's failure to allow an employee to take a lunch break creates an unsafe working condition is a factual question that is not beyond the ken of the average juror, and therefore, Dr. Hinds's testimony in that regard would not be helpful to the trier of fact.  Accordingly, because a factual question exists for a jury to decide, summary judgment is not appropriate.

Morever, there is evidence in the record that the applicable Collective Bargaining Agreement set forth the circumstances under which Defendant could direct an employee to finish inspecting a train before taking a lunch break and there is conflicting evidence regarding whether Defendant complied with the Agreement in that regard.  Accordingly, there are factual questions for a jury to decide regarding whether Defendant's failure to allow an employee to take a lunch at a time as set forth by the Agreement created a hazard or a potential hazard under FELA and if so, whether Defendant failed to comply with the Agreement when it directed Plaintiff to finish inspecting the third train.  Therefore, Defendant is not entitled to summary judgment on this element of Plaintiff's FELA claim.

**E.      Whether Either Party is Entitled to Summary Judgment on the Issue of Causation**

After carefully considering the matter, the Court answers this question in the negative, in part for the reasons stated by the parties in their respective opposition memoranda of law.  (Dkt No. 33, at 13-15 [Pl.'s Opp'n Mem. of Law]; Dkt. No. 32-14, at 2-8 [Def.'s Opp'n Mem. of Law].)  The Court would add the following points.

In support of its motion for summary judgment, Defendant argues that Plaintiff cannot establish that Mr. Sam's and Mr. Hensley's denial of Plaintiff's request for a lunch break directly caused Plaintiff's injury.  As indicated above in Part II.C. of this Decision and Order, under FELA, the test is whether the Defendant's negligence played any part, even the slightest, in causing Plaintiff's injury.  Therefore, Defendant's argument that Plaintiff has not shown that the denial of his request for a lunch break directly caused him to faint is misplaced.  The test is whether the denial of Plaintiff's request for a lunch break played even the slightest part in causing Plaintiff's injury, which is a question to be resolved by the fact finder.  For this reason, Defendant is not entitled to summary judgment on the issue of causation.

In support of his motion for partial summary judgment regarding the issue of "medical causation," Plaintiff argues that there is no question of fact that the February 19, 2009 injury to Plaintiff's right knee caused, at least in part, Plaintiff's need for a total knee replacement.  As Defendant correctly points out, the only direct evidence of the manner of injury is Plaintiff's testimony.  Because "matters of credibility are not to be determined on a motion for summary judgment[,]" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 696 (2d Cir. 2012), the Court cannot grant summary judgment regarding a fact question that depends on resolution of a credibility issue.  Therefore, for this reason, Plaintiff is not entitled to summary judgment on the issue of medical causation.

30

**ACCORDINGLY**, it is

**ORDERED** that the motion for summary judgment by Defendant, CSX Transportation (Dkt. No. 29) is **<u>DENIED</u>**; and it is further

**ORDERED** that the motion for partial summary judgment by Plaintiff, Dennis F. Krause (Dkt. No. 30) is **<u>DENIED</u>**; and it is further

**ORDERED** that the motion in limine by Defendant, CSX Transportation (Dkt. No. 28) is **<u>GRANTED</u>**; and it is further

**ORDERED** that counsel are directed to appear on **DECEMBER 18, 2013  at 11:30 a.m.** in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time.  Plaintiff is further directed to forward a written settlement demand to defendant no later than **DECEMBER 4, 2013**, and the parties are directed to engage in meaningful settlement negotiations prior to the pretrial conference.  In the event that counsel feel settlement is unlikely, counsel may request to participate via telephone conference for the limited purpose of scheduling a trial date by electronically filing a letter request at least one week prior to the scheduled conference.

Dated: November 20, 2013
       Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge